# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| KMART CORPORATION and KMART OF NORTH CAROLINA, LLC, | |
| Plaintiffs, | MEMORANDUM OPINION AND RECOMMENDATION |
| v. | |
| CRAGMERE ASSOCIATES, LLC, | 1:06CV751 |
| Defendant. | |

This declaratory judgment action is before the court on both parties' motions for summary judgment (docket nos. 26, 28). Each party has responded to the other's motion, and the matter is ripe for disposition. Furthermore, the parties have not consented to the jurisdiction of the magistrate judge; therefore, the motions must be dealt with by way of recommendation. For the following reasons, it will be recommended that the court grant Plaintiff's motion, deny Defendant's motion, and enter an order declaring that Defendant is responsible for paying for the cost of a new parking lot on the subject property that Plaintiff leases from Defendant.

## BACKGROUND AND FACTS

This declaratory judgment action involves a lease dispute between Plaintiff/tenant Kmart and Defendant/landlord Cragmere Associates, LLC

("Cragmere").[1] Cragmere is the owner and commercial landlord of a portion of a shopping center located at 1623 Way Street, Reidsville, North Carolina (the "Property"). Cragmere currently leases the Property to Kmart. The terms of the Lease are governed by an "Amendment of Lease and Amended and Restated Lease" (simply referred to hereinafter as the "Lease") dated February 18, 1992, entered into between Kmart and Cragmere's predecessor, Reidsville Centres, Ltd.[2] (Pl.'s Mem. Supp. Summ. J., Ex. B.)

The parties agree that the parking lot on the Property needs to be completely replaced at a substantial cost. On August 21, 2007, Kmart obtained an estimate for replacing the parking lot in the amount of $699,648.54. (*See* Pl.'s Mem. Supp. Summ. J., Ex. G, Cook Aff., Ex. 2.) The replacement would likely extend the useful life of the parking lot by about 20 years. (*See id.*) Although the parties agree that the parking lot needs to be replaced, the parties disagree as to which party is responsible for the cost of replacing the parking lot. On September 6, 2006, Kmart filed a declaratory judgment action in this court, seeking a declaration that Cragmere, as the landlord, is responsible for the cost of replacing the parking lot.

---

[1] Jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332. Declaratory relief is sought under 28 U.S.C. § 2201.

[2] On February 23, 1993, the Lease was amended by a "First Amendment of Lease." The terms in the First Amendment of Lease do not alter the obligations of the parties with respect to the issue raised here. Reidsville sold the Property to Cragmere in 1994 and, pursuant to the sale, Cragmere assumed all future covenants and obligations of the landlord under the Lease. (Amended Answer, ¶ 11.)

Cragmere promptly asserted a counterclaim against Kmart, seeking a declaration that Kmart is responsible for the cost of replacing the parking lot. The parties agree that the sole issue before the court is which party is responsible for the cost of replacing the parking lot under the terms of the Lease. For the following reasons, I conclude that Defendant Cragmere is responsible for paying for the cost of replacing the parking lot.

## STANDARD OF REVIEW

### Summary Judgment Standard

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "set forth specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting FED. R. CIV. P. 56(e)).

In making a determination on a summary judgment motion, the court views the evidence in the light most favorable to the non-moving party, according that party the

-3-

Case 1:06-cv-00751-TDS-WWD   Document 35   Filed 02/01/08   Page 3 of 16

benefit of all reasonable inferences. *Bailey v. Blue Cross & Blue Shield of Va.*, 67 F.3d 53, 56 (4th Cir. 1995). Mere allegations and denials, however, are insufficient to establish a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Judges are not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party." *Id.* at 251 (citations omitted). Thus, the moving party can bear its burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish its claim. *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting). "[A] complete failure of proof concerning an essential element of [a plaintiff's] case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. With these principles in mind, the court will address the parties' respective motions for summary judgment.

**DISCUSSION**

The Lease Agreement

The terms of the Lease govern the relationship between Cragmere and Kmart. First, the Lease gives Kmart, as the tenant, use of the Common Area. The Common Area is defined in Section 1 of the Lease as follows:

> Landlord hereby grants to Tenant the non-exclusive right to use, in common with other tenants of the Shopping Center, the portions of the Shopping Center intended to be for common use, including, but not limited to, any parking areas, roads, curb-cuts, streets, drives, tunnels, passageways, landscaped areas, open and enclosed malls, exterior

ramps, walks and arcades (hereinafter collectively called "Common Area").

(Pl.'s Br. Supp. Summ. J., Ex. B.) Sections 6.B. and 7.A. of the Lease govern Kmart's and Cragmere's obligations with respect to common area maintenance and common area costs. Section 6.B. of the Lease sets forth the landlord's obligations regarding common area maintenance and provides:

> Landlord shall keep and maintain, at Landlord's cost and expense, the Common Area in good condition and repair, including, but not limited to, *repairing and replacing paving;* keeping the Common Area properly cleaned, drained, free of snow, ice, water, rubbish, and other obstructions, and in a safe, neat, clean, orderly and sanitary condition; keeping the Common Area and such other areas suitably lighted during, and for appropriate periods before and after, Tenant's business hours; maintaining signs, markers, painted lines . . . and other means of pedestrian and vehicular traffic control; maintaining adequate roadways, entrances and exits; and maintaining any plantings and landscaped areas; and also, if required by appropriate governmental authority having jurisdiction thereof, maintaining traffic signals or lights, as the case may be, which are presently installed or may be installed hereafter, servicing tenants' businesses conducted in the Shopping Center.

(*Id.* (emphasis added).)

Section 7.A. of the Lease, titled "Tenant's Common Area Charge," requires the tenant to reimburse the landlord for common area maintenance charges. It provides, in relevant part:

> Tenant's "Common Area charge" shall mean, for any period, the product of (a) the actual cost and expense to Landlord for the maintenance and operation of the Common Area (hereinafter called "Common Area costs") for such period, and (b) the Fraction (as defined in Article 4). The Common Area costs shall be limited to amounts paid by Landlord in respect of the Common Area for the work Landlord is required to do and the items Landlord is required to furnish under subdivision B of Article 6 and the Common Area liability insurance

-5-

> Landlord is required to furnish under subdivision G of Article 6, not including any amounts for removal of rubbish of individual tenants of the Shopping Center. The Common Area costs *shall not include* Real Estate Taxes; any costs of performing Landlord's Work; insurance premiums for casualty or liability covering other buildings or any other insurance except common area liability insurance; *capital expenditures*; interest; depreciation; office overhead, salaries of persons whose functions extend beyond the care of the Common Area or profit for Landlord on any Common Area costs.

(*Id*. (emphasis added).) Thus, under the plain terms of the Lease, "capital expenditures" are specifically excluded from the common area costs that can be charged to Kmart.

Kmart argues that the replacement of the parking lot constitutes a capital expenditure, which is Cragmere's responsibility under the Lease. Cragmere argues, on the other hand, that under the plain terms of the Lease, Kmart is responsible for the costs of "repairing and replacing paving," which includes replacing the entire parking lot. The court's principal objective in the interpretation of a contract's provisions is to ascertain the intent of the parties, as set forth by the plain language of the contract.[3] *Salvaggio v. New Breed Transfer Corp.*, 150 N.C.App. 688, 689-90, 564 S.E.2d 641, 643 (2002). Where the language of a contract is clear and

---

[3] As a federal court sitting in diversity, this court must apply the choice-of-law rules of North Carolina's highest court, the North Carolina Supreme Court. *Private Mortgage Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002). In contract actions, the North Carolina Supreme Court adheres to the choice-of-law rule of *lex loci contractus*, which focuses on the State where the contract was formed. *See Fortune Ins. Co. v. Owens*, 351 N.C. 424, 428, 526 S.E.2d 463, 466 (2000). The Lease here was apparently formed in Michigan. (*See* Pl.'s Mem. Supp. Summ. J. at 16 n.6.) It does not matter, however, whether Michigan or North Carolina law applies in interpreting the Lease because both states apply the same substantive principles in construing a contract. Therefore, for simplicity's sake, I will refer to North Carolina law regarding contract interpretation.

-6-

unambiguous, its construction is a matter of law and the court must enforce the contract as it is written. *Hemric v. Groce,* 169 N.C.App. 69, 76, 609 S.E.2d 276, 282 (2005).

The court first looks to the plain meaning of the words in the contract. The Lease clearly states that Cragmere, as the landlord, must pay for "capital expenditures." The Lease does not define the term "capital expenditure." The court must, therefore, look to the plain dictionary meaning of capital expenditure. *See Kroger Ltd. P'ship I v. Guastello*, 177 N.C.App. 386, 390, 628 S.E.2d 841, 844 (2006). Black's Law Dictionary defines "capital expenditure" as "[a]n outlay of funds for the acquisition or improvement of a fixed asset which extends the life or increases the productivity of the asset." BLACK'S LAW DICTIONARY 209 (6th ed. 1990). In determining the plain meaning of "capital expenditure," it is also useful to look to the federal income tax laws. The Internal Revenue Code regulations define "capital expenditure" as:

> (a) . . . (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate, or (2) Any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made in the form of a deduction for depreciation, amortization, or depletion. (b) In general, the amounts referred to in paragraph (a) of this section include amounts paid or incurred (1) to add to the value, or substantially prolong the useful life, of property owned by the taxpayer, such as plant or equipment, or (2) to adapt property to a new or different use. Amounts paid or incurred for incidental repairs and maintenance of property are not capital expenditures within the meaning of subparagraphs (1) and (2) of this paragraph.

26 C.F.R. § 1.263(a)-1. The Internal Revenue Code regulations further clarify the meaning of the term "capital expenditure" by explaining that repairs are generally not capital expenditures, unless they are repairs in the nature of replacements:

> The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense . . . . Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve if such an account is kept.

26 C.F.R. § 1.162-4. Moreover, the Tax Court has analogized the distinction between repairs and capital expenditures to the distinction between repairs and replacements, stating that "[t]o repair is to restore to a sound state or to mend, while a replacement connotes a substitution." *Appeal of Ill. Merchs. Trust Co.*, 4 B.T.A. 103, 106 (T.C. 1926). The Tax Court has further observed that a repair "does not add to the value of the property, nor does it appreciably prolong its life"; a repair "merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired." *Id.* According to the Tax Court, repairs "are distinguishable from . . . replacements, alterations, improvements or additions which prolong the life of the property, increase its value, or make it adaptable to a different use." *See id.*

Finally, the Tax Court has specifically held that work performed on the pavement of a parking lot is a capital expenditure where it consists of more than a

mere repair. *Coors v. Comm'r*, 60 T.C. 368, 403-04 (T.C. 1973). In *Coors*, for instance, the court explained that application of the "slurry seal" to a parking lot was not a capital expenditure because the practice of putting a "slurry seal" on the parking lot was a "make-do, recurring item," rather than a replacement. *Id.* at 404. The court also found, however, that the work of asphalt paving was a capital expenditure because it was "not merely a repair." *Id.*

Applying the above definition of capital expenditure in this case, I find that replacing the parking lot is a capital expenditure. That is, replacing the entire parking lot will increase the value of Cragmere's property and appreciably prolong its useful life; thus, replacement of the parking lot constitutes a capital expenditure. Since replacing the parking lot is a capital expenditure, Cragmere is responsible for this cost under the Lease. Moreover, the fact that the Lease, in the common area costs section, requires Kmart to reimburse Cragmere for the costs of "repairing and replacing paving" does not alter this conclusion. As used in the section regarding common area costs, the phrase "repairing and replacing paving" does not include replacing the entire parking lot; it merely means maintaining the parking lot in order

to retain its current value.[4]  Under the plain meaning of the Lease, then, Cragmere is required to pay to replace the parking lot.

Cragmere contends, however, that the cost to replace the parking lot is not a capital expenditure within the plain language of the Lease. While Cragmere concedes that replacing a parking lot can be classified as a "capital expenditure" in certain circumstances, such as for IRS purposes, Cragmere contends that in the context of a lease it may constitute a common area maintenance expense. Cragmere notes that the term "capital expenditure" is not defined in the Lease, and contends that "construing it to include 'replacing paving,' which is included elsewhere as a Common Area cost for which Kmart is liable, is not only erroneous, but treats the term as if it exists in a vacuum." (Def.'s Br. In Opp. at 13.) Cragmere notes, moreover, that merely because a term is excluded as a common area cost does not necessarily mean that Kmart is not otherwise responsible for paying it. Cragmere notes, for example, that "Real Estate Taxes" are excluded from common area costs, but Kmart is liable for and pays them under Article 4 of the Lease.

In further support of its argument that replacement of the parking lot is not a capital expenditure, Cragmere cites to an unpublished North Carolina Court of

---

[4] To support its interpretation of the Lease, Plaintiff has submitted a report of a commercial leasing expert. Because the language of the Lease is clear and unambiguous, the court does not consider the expert report. *See Gaynoe v. First Union Direct Bank, N.A.,* No. 97 CVS 16536, 2001 WL 34000142, at *5 (N.C. Super. Ct. Jan. 18, 2001) (applying Georgia contract law, stating that to consider an expert report where contract language is unambiguous is error).

Appeals decision, *N.C. Industrial Capital, LLC v. Rushing*, 163 N.C.App. 204, 592 S.E.2d 620 (2004) (Table). In *Rushing*, a commercial lease obligated the tenant to pay a pro rata share of Common Area Operating Expenses ("CAOE"), which were defined as "all costs incurred by [landlord] relating to the ownership and operation of the Industrial Center," including the "operating, repair and maintenance, in neat, clean, good order and condition, of . . . [t]he common areas, including parking areas." *Id.* at *1. The landlord invoiced the tenant for his share of the costs to pave a new parking lot and to make major roof repairs. The tenant disputed the charges, arguing that the costs were "capital improvements" rather than "operating expenses." *Id.* at *3. The court held that the tenant was liable for the costs. In concluding as much, the court noted that the lease made no distinction between operating expenses and capital improvements. The court concluded that "all costs means *all costs*," and that "the plain language of the lease is broad enough to include as CAOE paving a new parking lot and making major repairs to the roof." *Id.* (emphasis in original). Cragmere contends that, like the lease in *Rushing*, the language of the Lease here is broad enough to require Kmart to pay for the cost of replacing the parking lot.

Cragmere's argument is without merit. First, as noted, although the term "capital expenditure" is not defined in the Lease here, the plain meaning of that term necessarily includes the replacement of an entire parking lot. The plain language of the Lease states that the landlord must pay for capital expenditures and that the

-11-

tenant must reimburse the landlord for the costs of "repairing and replacing paving" in the common area. These two provisions do not render the Lease ambiguous. In other words, the court would find some ambiguity in the Lease if perhaps the Lease stated that the landlord must pay for capital expenditures but that the tenant must for pay for "repairing and replacing the parking lot." Such provisions would be irreconcilable, since replacing an entire parking lot *is* a capital expenditure. The plain language of this contract does not require Kmart, as the tenant, to pay for the cost of replacing the entire parking lot; it merely requires Kmart to pay for "repairing and replacing paving." The only reasonable interpretation of this provision is that the phrase "repairing and replacing paving" refers to routine repairs of the parking lot in order to keep it in working condition. If the parties had intended for the landlord to pay for all capital expenditures *except for* replacement of the parking lot, the contract would certainly have explicitly stated as much, as it would constitute a material exception to the capital expenditures clause. For instance, the Lease would have stated, in relevant part, "The Common Area costs *shall not include . . . capital expenditures, except for the costs of repairing and repaving the parking lot.*" Under Cragmere's interpretation, however, the language in the Lease defining common area expenses would nullify the exclusion for capital expenditures altogether, which is an unreasonable interpretation of the Lease.

Moreover, the language in the Lease here is simply not as broad as the language in the lease in *Rushing*. In *Rushing*, the lease did not contain a specific

-12-

exclusion for capital expenditures. The court there noted that the lease made no distinction between "capital improvements" and "operating expenses." *Id.* at *3. This Lease, however, specifically excludes "capital expenditures" from the common area costs. For all these reasons, I find that under the plain meaning of the language in the Lease, Cragmere is required to pay for the cost of replacing the parking lot.

Cragmere's Estoppel Argument

Cragmere also contends that Kmart should be equitably estopped from arguing that Cragmere is obligated to pay for the parking lot replacement.[5] Cragmere contends that Kmart acknowledged in written correspondence that it was responsible for paying for replacement of the parking lot. Cragmere notes, for instance, that on December 22, 1999, Kmart's Project Manager, William H. MacDonald, informed Cragmere by letter that "Kmart Corporation will be starting HVAC Rooftop Retrofit and Asphalt Parking Lot Paving Projects for the [Property] at the beginning of the year 2000." (Def.'s Reply, Ex. F., MacDonald Letter.) Cragmere asserts that upon receipt of the MacDonald Letter, Cragmere attempted to contact MacDonald and that MacDonald's secretary confirmed to Cragmere that Kmart would be paying for the entire cost of the Asphalt Parking Lot Paving Project. According to Cragmere, Kmart's store manager and operations manager further

---

[5] In Kmart's brief supporting summary judgment, Kmart anticipates an argument by Cragmere that the parties orally modified the Lease, and Kmart asserts a Statute of Frauds defense. Rather than asserting oral modification, however, Cragmere argues in its own brief that equitable estoppel should apply.

informed Cragmere that Kmart was responsible for the Parking Area and was planning to spend $100,000 on this project. Cragmere contends that the "foregoing information was memorialized by the hand-written notations on the MacDonald letter." (Def.'s Br. In Opp. at 18; *see* Def.'s Reply, Ex. F, MacDonald Letter.) Cragmere contends furthermore that Kmart prepared a spreadsheet titled Mideastern Region Facility Opportunities (2000) ("the Matrix"), which indicates that: (i) the Property's Parking Area is in a state of deterioration; (ii) Kmart is responsible for the Parking Area; and (iii) Kmart submitted an internal request for approval of funds to pay for the cost to replace the Parking Area. (*See* Def.'s Reply, Ex. G.)

Cragmere contends that it is also noteworthy that no current Kmart employee has first-hand knowledge about the facts and circumstances surrounding the execution of the Lease or the parties' intentions at that time. (*See* Def.'s Br. In Opp., Ex. D, Gibron Dep., p. 141.) Cragmere contends that Kmart is, therefore, unable to produce any evidence contradicting the parol evidence submitted by Cragmere showing that, before this dispute, Kmart interpreted the provisions of the Lease to mean that Kmart is responsible for the cost of replacing the parking lot. According to Cragmere, "[t]herefore, based on Kmart's own actions, Kmart has admitted that the intent of the parties is for Kmart, as Tenant, to be responsible for the cost of repairing and replacing the Parking Area, and Kmart should be estopped from now arguing to the contrary." (Def.'s Br. In Opp. at 19.)

In response to Cragmere's equitable estoppel argument, Kmart insists that it has never represented to Cragmere that Kmart was responsible under the Lease for paying for the cost of replacing the entire parking lot. Kmart contends, rather, that it merely assumed the duty of maintaining the parking lot area when Cragmere stopped doing it in March 1999. I find that, even assuming that Kmart represented to Cragmere that it would pay to replace the parking lot, Cragmere's equitable estoppel argument fails.[6] Under North Carolina law, "[i]t is essential that the person asserting the estoppel shows that he or she acted in reliance on the conduct of the person against whom estoppel is asserted, not merely that he or she was aware of certain facts which in retrospect might support the assertion of estoppel." *Deal v. N.C. State Univ.*, 114 N.C.App. 643, 645, 442 S.E.2d 360, 362 (1994). Moreover, the person asserting estoppel must show that it was prejudiced by its reliance on the other person's assertion. *See Inland Constr. Co. v. Cameron Park II, Ltd., LLC*, 181 N.C.App. 573, 575-77, 640 S.E.2d 415, 417-19 (2007) (where the plaintiff sent an email to defendant stating that plaintiff would perform HVAC work for the defendant at no additional cost, the defendant could not claim equitable estoppel and refuse to pay because, even assuming defendant could prove the first two elements of

---

[6] To the extent that Cragmere is arguing that Kmart's statements offer evidence of its own, subjective interpretation of the Lease, I have already found that the terms of the Lease are unambiguous. In construing a contract that is unambiguous, a court must discern the intent of the parties by considering the objective evidence, not the subjective intent of the parties. *See Vestal v. Vestal*, 49 N.C.App. 263, 268, 271 S.E.2d 306, 310 (1980). Kmart's own subjective intent therefore is irrelevant.

-15-

equitable estoppel, it failed to show how it changed its position prejudicially). Cragmere has shown neither reliance nor prejudice resulting from Kmart's alleged representation that Kmart was responsible for the cost of replacing the parking lot; thus, Cragmere's equitable estoppel argument fails.

**CONCLUSION**

Accordingly, for all these reasons, it is **RECOMMENDED** that the court **GRANT** Plaintiff's motion for summary judgment (docket no. 26), **DENY** Defendant's motion for summary judgment (docket no. 28), and declare that Defendant Cragmere is responsible for the cost of replacing the parking lot.

_____
WALLACE W. DIXON
United States Magistrate Judge

Durham, NC
February 1, 2008